**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | |
| v. : | Case No.: 1:19-cr-00087 (TNM) |
| : | |
| **CHUNYAN WANG,** : | |
| **Defendant** : | |
| : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this opposition to the Defendant's Motion to Dismiss, ECF No. 23. In support of its opposition, the United States relies on the following points and authorities and such other points and authorities that may be cited at a hearing regarding this motion.

**FACTUAL BACKGROUND**

The defendant, Chunyan Wang, is a citizen of China who entered into the United States in March 2016 on a B-2 visitor's visa. On August 10, 2016, the defendant applied for asylum. She resides in the Commonwealth of Virginia while her asylum claim remains pending. Since her arrival in the United States, Wang has engaged in multiple protests against visiting officials from the Government of the People's Republic of China ("China"), including the two incidents which are at issue in the present case.

**I.      January 30, 2019 Incident**

On January 30, 2019, a delegation from the Government of China, including Vice Premier Liu He (hereinafter, "the Protectee"), was in the District of Columbia on an official visit. During the official visit, which included meetings with U.S. government officials, Special Agents from

the Department of State's Diplomatic Security Service ("DSS") were assigned to protect the delegation pursuant to the Diplomatic Security Act, 18 U.S.C. § 4802.

During the official visit, the Protectee and his delegation resided at the Willard Hotel, located at 1401 Pennsylvania Avenue, NW.  At approximately 8:34 a.m., DSS agents escorted the Protectee out of the Willard Hotel pedestrian exit on Pennsylvania Avenue towards a black Chevrolet Suburban parked near the sidewalk. The vehicle was operated by a DSS Special Agent and had a DSS agent posted at the rear right door. The Protectee was scheduled to travel to a meeting at the Office of the U.S. Trade Representative.

As the Protectee and the DSS detail emerged from the hotel, the Defendant and a group of individuals rushed towards the Protectee, who at the time was surrounded by Special Agents. The incident was captured on a video featured on Bloomberg News. See Exhibit A (a 36 second video). . In that video clip, the defendant is the woman in the black jacket and pants wearing a bright green scarf who enters the frame at approximately the seven second mark. As the video shows, the defendant did not "merely approach[]" the Protectee on the public sidewalk as she now contends, see Mt. to Dismiss at 2, 7; rather, the defendant ran straight towards the Protectee with her arms stretched out and screaming while the Protectee was located in the street as he attempted to enter reach the vehicle. Exhibit A. As a result of her actions, at least one Special Agent had to move out of formation and place himself between the defendant and the Protectee to prevent the Defendant from reaching and laying her hands on the Protectee. Other agents were also forced to depart from their designated locations in the formation to address her conduct. Id. Nor did the agent "immediately push[] her to the ground as the defense contends. Mt. to Dismiss at 3. As the video shows, although the agent stepped between the defendant and the Protectee, the defendant only fell to the ground as she attempted to reach around the agent and impede the Protectee's forward

progress to the vehicle. Exhibit A at the ten second mark.

## II.     February 22, 2019 Incident

During the February 22, 2019 incident, the same Protectee was once again in the District of Columbia on an official visit to meet with U.S. Governmental officials. Once again, the delegation resided at the Willard Hotel.

In response to protests and harassment directed at previous Chinese government delegation visits to the United States, including the January 30, 2019 incident noted above, DSS arranged to use the hotel's underground garage on F Street NW for motorcade movements to provide increased security. The garage has a single entrance/exit ramp that allows for a more controlled movement of the detail, as the Protectee enters and exits the vehicle from within the garage.

At approximately 8:50 a.m., the DSS motorcade with the Protectee and his delegation exited the Willard Hotel's underground parking garage. DSS personnel were staged on foot at the top of the garage ramp.   Additionally, DSS personnel had placed bicycle rack-style crowd barriers that were marked with a plastic placard containing the words "POLICE LINE" on the sidewalk on each side of the garage entrance/exit.

As the DSS motorcade departed the garage, passed the crowd barriers, and turned right on F Street, NW, headed towards 14th Street NW, the defendant ran from the sidewalk across from the garage, directly into the middle of the street toward the moving DSS limousine. See Exhibit B (security camera footage from the Department of Treasury that overlooks F Street, NW at 15th Street, NW). Once again, the defendant is observed frantically waving her arms at the motorcade limousine.    As the video shows, the defendant comes within feet of the moving vehicle, only to be intercepted by a DSS Special Agent who sprinted from his assigned position when he saw the Defendant begin to rush toward the vehicle. The agent then pushed the defendant against a parked

van on the north side of the street. Keeping his body between the defendant and the motorcade only long enough for the motorcade to pass without further incident, the agent then permitted the defendant to leave the area. Id.

On March 6, 2019, the Defendant was charged by Information with two counts each of violating 18 U.S.C. § 112(b)(1) and (2), Willfully Harassing and Obstructing a Foreign Official or Official Guest, and 18 U.S.C. § 118, Interference with Protective Functions. The defendant was later arrested on a bench warrant issued when she failed to respond as ordered in the Summons issued concurrently with the filing of the Information.

## LEGAL STANDARD

The First Amendment guarantees that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people to peaceably assemble." U.S. Const. amend. I. While the First Amendment must have breathing room to survive, courts have consistently held that the First Amendment is not absolute and may be limited. See e.g., Chaplinksy v. New Hampshire, 315 U.S. 568, 572 (1942) (finding that "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or t-end to incite an immediate breach of the peace" are not protected by the First Amendment).

First Amendment challenges may take two forms: facial challenges and as applied challenges. In a facial challenge to a criminal statute, the defendant "must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739 (1987). A law may be invalidated as facially unconstitutional under the First Amendment if the statute is found to be either overbroad or vague. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494–95 (1982) (determining that in a facial challenge, the court must first analyze overbreadth. If the overbreadth challenge fails, then the court should

examine the vagueness of the law.). Overbreadth must be substantial and restrict more speech than the Constitution allows to be controlled. See Broadrick v. Oklahoma, 413 U.S. 601, 615–18 (1973) (upholding a state law that prohibited political activities by government employees because even though the effect of the law prohibited wearing of political buttons or displaying bumper stickers, the law was not substantially overbroad). A law is unconstitutionally vague if a reasonable person cannot tell what speech is prohibited and what is permitted. See Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971) (finding an ordinance that prohibited conduct that is "annoying" unconstitutionally vague).

By contrast, an as applied challenge requires "a court to assess a statute's constitutionality with respect to the particular set of facts before it." Hodge v. Talkin, 799 F.3d 1145, 1150, 1156 (D.C. Cir. 2015) (holding that a federal statute that restricted expressive activity within the Supreme Court building and grounds was constitutional as applied to the Supreme Court plaza).

## ARGUMENT

**I.    18 U.S.C. § 112(b)(1) is constitutional on its face because it is neither overbroad nor vague.**

18 U.S.C. § 112(b)(1) criminalizes conduct, not speech per se. Specifically, it prohibits actions willfully undertaken in order to intimidate, coerce, threaten, or harass a foreign official or an official guest, or to obstruct a foreign official in the performance of his duties. 18 U.S.C. § 112(b)(1). The defendant claims that 18 U.S.C. § 112 is unconstitutional on its face because the language of the statute "is so ambiguous that a reasonable person cannot tell what expression is forbidden and what is allowed." Mt. to Dismiss at 7. The Defendant, however, simply presents a conclusory assertion, and fails to provide any factual analysis.  Most significantly, however, the defendant's argument ignores established case law.

The Fifth Circuit conducted a thorough and detailed analysis of § 112 and concluded that

the statute was facially constitutional. CISPES (Comm. in Solidarity with People of El Salvador) v. Fed. Bureau of Investigations, 770 F.2d 468, 470 (5th Cir. 1985). In CISPES, a case involving picketers and protestors in front of the Honduran Consulate, the Fifth Circuit determined that § 112 was neither overbroad nor vague, and the statute merely prohibits threatening actions — not the content or message of the speech. Id. at 470–71, 473, 475–77 (rejecting the appellants' overbreadth argument because § 112's legislative history indicated that the statute was "designed to remove any question regarding the applicability of the statute to pickets and protests which did not otherwise violate the statute," and determining that words such as "intimidate," "coerce," "threaten," "harass," and "obstruct" are not unconstitutionally vague). The Supreme Court implicitly reached the same conclusion that § 112 was not unconstitutional on its face in Boos v. Barry, a civil protest case here in the District of Columbia. 485 U.S. 312, 324–29 (1988). In Boos, the Supreme Court rejected an analogy between § 112 and a local District of Columbia statute that made it unlawful to display signs that "intimidate, coerce, or bring into public odium any foreign government . . . or any officer or officers thereof." In doing so, the Court held that the local D.C. statute could not withstand First Amendment scrutiny, while § 112 was a readily available least restrictive alternative because it was "not narrowly directed at the content of speech but at an *activity*, including speech, that has the prohibited effects." (emphasis added).

Furthermore, subsection (d) of 18 U.S.C. § 112 explicitly provides that "[n]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the [F]irst [A]mendment." 18 U.S.C. § 112(d). See also Seals v. McBee, 898 F.3d 587, 590, 599 (5th Cir. 2018) (declaring a state statute that criminalized "'the use of violence, force, or threats' on any public officer or employee with the intent to influence the officer's conduct" unconstitutionally overbroad, but distinguishing 18 U.S.C. § 112 as constitutional

because § 112 was construed to avoid constitutional problems due to the statute's safe harbor provision and its legislative history).

In light of this caselaw and the lack of analysis as to how and why the statute is overbroad and/or vague, the defendants' claims that [t]he very language of [the] statute is so ambiguous that reasonable person cannot tell what expression is forbidden and what is allowed" is simply without merit. Mt. to Dismiss at 6.[1] The Defendant's claims that 18 U.S.C. § 112(b)(1) is unconstitutional must fail.

### II. Neither 18 U.S.C. § 112(b)(1), nor 18 U.S.C. § 118 are unconstitutional as applied to the Defendant because both statutes target the Defendant's conduct.

The defendant claims that 18 U.S.C. § 112(b)(1) and 18 U.S.C. § 118 unconstitutionally prohibit her protected speech. However, neither of these statutes target the Defendant's speech; instead, both statutes are content-neutral and only prohibit conduct and the manner in which certain types of speech is presented. As detailed above, 18 U.S.C. § 112(b)(1) criminalizes any person's conduct that "intimidates, coerces, threatens, or harasses a foreign official . . . or obstructs" a foreign official's duties. 18 U.S.C. § 112(b)(1). In the same vein, 18 U.S.C. § 118 criminalizes the actions of anyone who "knowingly or willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged . . . in the performance of protective functions" authorized under the Diplomatic Security Act (22 U.S.C. § 4802). 18 U.S.C. § 118.

The government may place reasonable time, place, and manner restrictions on a public forum if the restriction is content-neutral and narrowly tailored to serve a significant government

---

[1] The Defendant also asserts that 18 U.S.C. § 112(b)(1) "raises the very real risk . . . of selective enforcement and prosecution" because the statute is "so ambiguous" and vague. Mt. to Dismiss at 7. The defendant, however, does not actually argue or demonstrate *how* the statute risks selective enforcement or prosecution. Once again, the defendant's argument is conclusory and mere speculation. However, simply asserting that there is a risk of selective enforcement does not actually mean the risk exists. See Hill v. Colorado, 530 U.S. 703, 733 (2000) (noting that "speculation about possible vagueness in hypothetical situations . . . will not support a facial attack on a statute" when it is valid in most instances).

7

interest. See Police Dep't of Chicago v. Mosley, 408 U.S. 92, 99 (1972) (noting that all picketing is not always allowed and recognizing that "reasonable 'time, place and manner' regulations of picketing may be necessary to further significant governmental interests"); Cox v. New Hampshire, 312 U.S. 569, 575–76 (1941) (upholding an ordinance that required those wishing to organize a parade or demonstration obtain a permit); Mahoney v. United States Marshals Serv., 454 F. Supp. 2d 21, 32–37 (D.D.C. 2006) (finding that restrictions imposed by the United States Marshals Service and United States Secret Service, which prevented all members of the public (including protestors) from using sidewalks and streets in front of St. Matthew's Cathedral, were reasonable time, place, and manner restrictions to protect high-profile government attendees that attended the Red Mass).

In the present case, both 18 U.S.C. § 112 and 18 U.S.C. § 118 are reasonable time, place, and manner restrictions. The statutes are targeted at any *activity* that interferes with foreign officials or DSS protective functions, and do not target the topic or subject of speech (whether it be pure speech or expressive conduct). The statutes also further the government's significant interest in protecting foreign officials and diplomatic relations. See, e.g., Act for the Protection of Foreign Officials and Official Guests of the United States, Pub. L. No. 92-359, § 2, 86 Stat. 1070, 1071 (1972) (legislation to amend, inter alia, 18 U.S.C. § 112, and making a Statement of Findings and Declaration of Policy that "harassment, intimidation, obstruction, coercion, and acts of violence committed against foreign officials or their family members in the United States or against official guests of the United States adversely affect the foreign relations of the United States." and providing federal jurisdiction to "proceed against those who by such acts interfere with its conduct of foreign affairs). Lastly, to the extent that the defendant is claiming that her conduct was expressive, and therefore constitutes protected speech, any effect on her speech was

incidental and is nothing more than a reasonable time, place, and manner restriction. Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294 (1984) (noting that time, place, and manner restrictions may have "the purpose and direct effect of limiting expression but are nevertheless valid" under the First Amendment).

Ultimately, both 18 U.S.C. § 112(b) and 18 U.S.C. § 118 are reasonable time, place, and manner restrictions that target solely an individual's conduct, not an individual's speech. The time, place, and manner restrictions were reasonable to protect a foreign official and to ensure that DSS agents could carry out their protective functions.

The defendant falsely claims that in both incidents, she was "merely approaching the Chinese delegation with the intent to express dismay," Mt. to Dismiss at 7, but the videos of the incident, belie such characterization. As noted above, infra at 2, during the January incident the defendant rushed with outstretched arms towards the Protectee, who was at the time surrounded by DSS agents and trying to get to the motorcade vehicle in which they would be traveling. See Exhibit A. Rushing towards the Protectee with arms outstretched and attempting to reach around an agent who is physically juxtaposed between the defendant and the Protectee, both of whom are standing in the street and not on the sidewalk, is not calmly approaching or simply articulating your message as the defendant contends, but is instead intimidating, threatening, harassing and obstructing behavior towards a foreign official, as well as behavior that interferes with DSS's protective function. Likewise, the defendant was not merely part of a "group of individuals" that "approached the delegation," Mt. to Dismiss at 3, but instead was part of a swarm of people that were running towards the Protectee at the same time. See Exhibit A. As to her fall, the video clearly shows that the DSS agent did not push the defendant to the ground, but that the Defendant fell as a result of her collision with a specific DSS agent who had to move out of formation—thus,

interfering with the agent's protective functions—to prevent her from reaching the Protectee and further impeding his progress towards the vehicle. It is that conduct, and not the content of her speech while engaging in the conduct, that is prohibited by both 18 U.S.C. § 112(b) and 18 U.S.C. § 118.

The Defendant's mischaracterization of the facts is even greater with respect to the February incident. The Defendant claims that she merely "ran on a public sidewalk . . . toward a moving limousine . . . waving her arms as she approached" and that a federal agent "pushed Ms. Wang against a parked van." Mt. to Dismiss at 3. As explained infra at 3-4, the defendant actually ran *from* the sidewalk across from the garage *into* the middle of the street in a direct line towards the limousine turning onto the street. Moreover, she did so after pacing back and forth on the sidewalk in order to better position herself for her assault. But for the quick actions of one DSS agent who intercepted her dash across the street, the defendant would have been hit by and/or stopped the forward progress of the limousine. See Exhibit A.

The description of the events set forth in her motion is further undercut by the defendant's own words captured in another video that depicts the incident from an eye-level viewpoint.[2] Commenting on her own actions as she ran towards the limousine, the defendant explained that she was "running towards [the limousine] without any hesitation, without the slightest concern about whether I would end up with bloody face and broken bones. As long as I can revenge on them, I don't care about my life." Exhibit C at USAO-0082 (excerpt from a DSS translation of the portion of the YouTube video where the defendant speaks for an extended period of time). She continues on, explaining that "[The American policeman] caught me and pushed me to the front

---

[2] This video was published as a live stream on YouTube and shows the defendant, along with two other protestors, discussing their protest activities that day and their reasons for protesting. This is the same video referenced on pages 4-5 of the Government's Motion in Limine, ECF No. 22, filed on June 17, 2019.

of the car. At that time, I truly had rushed to the front of the car, the front. I truly felt the thrill of having revenged for my family." Id. Acknowledging that she blocked the Protectee's car that day, the defendant went on to explain that "[n]ext time, I am going directly towards the front of [the Protectee's] car . . . rolling under [the Protectee's] car," and taunting the Protectee to "come on and drive over my body" if he "got balls." Id.   Contrary to the claim in her motion the defendant's clear purpose was not to just "hand a letter" to the Chinese delegation.[3] Mt. to Dismiss at 3.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Dismiss should be denied with prejudice.

                                        Respectfully submitted,

                                        JESSIE K. LIU
                                        United States Attorney
                                        D.C. Bar Number 472-845

By: _____/s/_____
       REAGAN N. CLYNE
       Virginia Bar No. 74767
       Special Assistant U.S. Attorney
       National Security Section
       United States Attorney's Office
       555 4th Street, N.W.
       Washington, D.C. 20530
       Reagan.Clyne@usdoj.gov
       (202) 252-7215

---

[3] Despite the defendant's assertion that she sought to give the Chinese government official a letter in both instances, at no time is the defendant seen in possession of a letter or other petition, or attempting to hand the official anything.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : Case No.: 1:19-cr-00087 (TNM) |
| CHUNYAN WANG,<br>          Defendant | : |

**OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS
EXHIBIT LIST**

| Exhibit | Description |
|:---:|---|
| A | Video of the January 2019 Incident |
| B | Video of the February 2019 Incident |
| C | DSS Translation of Video in Which the February 2019 Incident Is Shown and the Defendant Provides Commentary About Her Actions at the Incident |